IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DENNIS GIBSON, )
 )
 Plaintiff, )
 )
v. )CIVIL ACTION NO.  2:08CV127-SRW
 )
CITY OF GREENVILLE, et al., )
 )
 Defendants. )

## MEMORANDUM OF OPINION

Plaintiff Dennis Gibson brings this action against the City of Greenville ("the City"); its police department; its Chief of Police, Lonzo Ingram; and police officers Byron Russell and Lionel Davidson.  Plaintiff's claims arise from his arrest by defendants Russell and Davidson on August 21, 2006.  Defendants move for summary judgment as to all of the claims. Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.[1]

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact.  Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).

---

[1] Plaintiff seeks no injunctive relief, but only damages. His claims against the police department and the officers and Chief in their official capacities are, accordingly, redundant given his claims against the City of Greenville.  Thus, these defendants will be dismissed.

For issues on which the non-movant bears the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ] – that is, point[ ] out to the district court – that there is an absence of evidence to support the non-moving party's case." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)(quoting U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991)(*en banc*)).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a

rational trier of fact to find for the nonmoving party. <u>Matsushita Electrical Industrial Company v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. <u>Welch v. Celotex Corp.</u>, 951 F.2d 1235, 1237 (11th Cir. 1992); <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## BACKGROUND[2]

Plaintiff's wife, Darlene Gibson, owns the Camellia Court Motel in Greenville, Alabama, and the Gibsons reside at the motel. On August 21, 2006, Mrs. Gibson called the Greenville police department with a noise complaint relating to a disturbance at the "old skating rink" next to the motel. The old skating rink is an empty building which is no longer open to the public; members of a band had been gathering and playing music in the building

---

[2] The court recognizes that defendants' version of the facts sharply contradicts plaintiff's. As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff and, where the evidence conflicts, it has accepted the evidence relied on by plaintiffs as true. <u>Welch v. Celotex Corp.</u>, 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not made to the use or admissibility of the evidence to be waived for purposes of this motion. <u>Davis v. Howard</u>, 561 F.2d 565, 570 (5th Cir. 1977).

over a period of about eighteen months. Mrs. Gibson had called the police "numerous" times previously to complain about the loud music.

Plaintiff arrived at the motel after his wife called the police, but before the police arrived. Mrs. Gibson told him that she had called the police for the second time that afternoon because of "that band next door" and plaintiff went into the motel office. When the police arrived, plaintiff watched from inside the office as his wife spoke with the officers outside. Officer Russell asked Mrs. Gibson "what the problem was," and she responded that it was the loud music next door at the old skating rink. He told her that the officers had stopped by the rink and did not hear any loud music. The officers explained that there was nothing they could do since they did not hear the noise, and told her to call back if she heard it again.

The officers got back into their car and continued to talk with Mrs. Gibson. Plaintiff saw that she was getting upset and headed outside. As he went through the door, he heard Officer Russell saying, "I don't know what your damn problem is, lady." Plaintiff proceeded through the door and turned to speak to his wife. He told her, in a normal tone of voice, "[B]aby, don't worry about it . . . they've just got a damn bad attitude; let's go back in the house." He also said, "[t]hey ain't going to do nothing; you're wasting your phone call; all you're doing here is irritating yourself[.] [3] Mrs. Gibson was two to three feet from the

---

[3] <u>See</u> Plaintiff's depo. at 67, 81-83, 128. Plaintiff's wife testified that plaintiff said to her, in a normal tone of voice, "I guess we're going to have to get a camera and tape those assholes next door because you can't get these assholes to do anything." (Trial transcript, p. 40). She also stated that plaintiff said, again to her, that the officers had a "God damn bad attitude." (<u>Id.</u>, p. 39). Since this evidence conflicts with plaintiff's testimony regarding what he said, the court accepts plaintiff's

driver's window of the patrol car. Plaintiff was standing toward the back end of the police car, about two feet away from it, facing the motel's office door. His back was to the officers, and he did not speak to them or approach the police car. Neither plaintiff nor Mrs. Gibson heard either officer tell plaintiff that he was under arrest or threaten to place him under arrest.

According to plaintiff, Officer Russell, who was seated on the passenger side of the patrol car, got out of the car and hit plaintiff from behind, pushing him into the glass door of the office. Davidson, who was in the driver's seat, also exited the car. Plaintiff's hands went up and hit the glass door, and one of the officers handcuffed his left wrist and the other officer handcuffed his right using a different set of handcuffs. Russell yelled at plaintiff to give Russell his other hand; plaintiff could not do so because Davidson had his other hand. The officers jerked plaintiff's arms back, "flipped" plaintiff, and knocked him face-down on the cement ground. The officers twisted the plaintiff's arms up behind him. Plaintiff did not resist the officers at any point. While plaintiff was "subdued on the ground, laying there face down on the ground," with his arms restrained behind him, Russell lifted plaintiff's head up by his hair. Russell was laughing, and told Davidson to "[s]tart spraying the pepper spray, put it in his eyes; put it in his nose; put it in his mouth." Davidson did so, using a constant spray and moving "from one thing to the other." He stuck the pepper spray inside plaintiff's mouth and sprayed it. Russell had his face down close to plaintiff's, looking plaintiff in the eyes and laughing.

_____

testimony as true for purposes of this motion. See Plaintiff's deposition, p. 81 (plaintiff responding in the negative when asked whether he said he would "put a goddamn camera and speaker up").

Mary Erwin and Deborah Lowery were visiting Mrs. Gibson and were inside the motel; when Davidson began spraying plaintiff in the face, Mrs. Gibson started yelling for her guests to come outside. While he was spraying plaintiff's face, Officer Davidson accidentally also sprayed Officer Russell in the face with the pepper spray. Other officers arrived at the scene. While Russell was washing his eyes and face with bottled water, Officer Deiss put plaintiff into the back of a patrol car. Plaintiff could not see who was driving. One of the officers asked plaintiff whether he had been drinking; plaintiff responded that he had earlier had two beers. Plaintiff drank the beers about two hours before his arrest and was not intoxicated.

When plaintiff arrived at the jail, Officer Russell was there, spraying himself off with a hose. The officers did not take plaintiff out to wash off the pepper spray until later, after the two women running the jail refused to allow the officers to check plaintiff into the jail until he had been cleared medically. Plaintiff remained in jail for about four hours. When he was released, his wife took him to the hospital emergency room for treatment. Defendant was tried on charges of disorderly conduct and resisting arrest in the District Court of Butler County, Alabama, on December 5, 2006. By order entered on February 28, 2007, District Judge J. MacDonald Russell, Jr. found plaintiff "not guilty" of the charged offenses. (Plaintiff's depo., pp. 25-27, 47-50, 66-67, 71-102, 95-96 106-07, 123-35, 142-43, 146-47; Defendants' Exhibit 2, trial transcript, pp. 1, 7, 10, 24, 27, 37-38, 41- 50; Defendants' Exhibit 3, Erwin aff.; Defendants' Exhibit 3, Lowery aff.; Defendants' Exhibit 3, Butler County District Court subpoenas and judgment of acquittal).

**DISCUSSION**

**Plaintiff's Claims**

Before it can proceed on the summary judgment motion, the court must first determine the precise legal basis for each of plaintiff's claims. In his complaint, plaintiff divides his claims into two sections: the first bears a sub-heading which reads, "Federal Claim: Violation of the Fourth Amendment and Fourteenth Amendment," and the second is entitled, "State Law Claims." (Complaint, pp. 5, 7). The first section includes only Count I, which is styled "Excessive Force." Within this claim, plaintiff also alleges that he was "falsely arrested" and "falsely imprisoned." (Id., p. 5). The second section – "State Law Claims" – includes Counts II through VI. Count II is entitled "False Imprisonment." Within the claim, however, plaintiff alleges that defendant's actions violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.[4] Because plaintiff's complaint was drafted by an attorney who designated this claim as one arising under state law and because the Sixth Amendment, on the facts alleged by plaintiff, does not provide a legal basis for a claim,[5] the

---

[4] Plaintiff alleges that the defendants "did unlawfully detain Plaintiff and, with excessive force, caused Plaintiff to go where he did not wish to go, and against Plaintiff's Constitutional right secured by the Sixth and Fourteenth Amendments to the Constitution of the United States, prevented Plaintiff from moving, and placed Plaintiff in a position where he could not exercise his free will, or go any where he might lawfully go." (Complaint, Count II, ¶ 33).

[5] The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense." U.S. CONST. AMEND. VI.

court concludes that Count II alleges a state law false imprisonment claim. Count III is a state law assault and battery claim,[6] and Count IV is a malicious prosecution claim arising under state law.  Count V is a state law unlawful arrest claim, and Count VI is a state law negligent training and supervision claim against Ingram and the City.[7]

---

[6]  Count III states that plaintiff was "falsely arrested and falsely imprisoned without any medical attention for his injuries." (Complaint, ¶ 41). Again, because plaintiff's complaint was drafted by an attorney, the court concludes that this language is not intended to assert any additional claim beyond assault and battery. As discussed above, plaintiff asserts a state law false imprisonment claim in Count II.

[7]  The court again defers to counsel's designation of the claims as "State Law Claims[,]" despite counsel's inclusion of language suggesting that defendants' actions violated his rights under various amendments of the Constitution of the United States.  In Count V, which is styled "Unlawful Arrest," plaintiff asserts – as in Count II – that the unlawful arrest violated his rights under the Sixth Amendment.  He further alleges that he "was deprived of life, liberty or property without due process of law, and the right to equal protection of the law, secured by the Fifth, Sixth and Fourteenth Amendment of the Constitution of the United States." (Complaint, ¶ 54). In Count VI, entitled "Negligent Training and Supervision," plaintiff alleges that Ingram and the City "permitted and or failed to prevent the intentional tortuous conduct of Defendant Russell and Defendant Davidson in their acts and or omissions of using excessive force, unlawfully arresting, unlawfully imprisoning Plaintiff thereby depriving Plaintiff of his Constitutional Rights as afforded pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States." (Complaint, ¶ 58).

In Count I – the only claim plaintiff designates as a federal claim – plaintiff specifically invokes 42 U.S.C. § 1983. (Complaint, ¶ 29). Although plaintiff alleges in his "Statement of Jurisdiction" that his claims are "brought pursuant to the Code of Alabama, 1975 and 42 USC § 1983 et. seq." (Complaint, ¶ 8), he does not explicitly reference § 1983 in any of the claims falling within the "State Law Claims" section of his complaint. The court concludes that this was not an inadvertent omission but that plaintiff meant what he said – that these are state law claims. The court notes, further, that claims of excessive force during an arrest arise under the Fourth Amendment, as do claims of arrest without probable cause, that plaintiff has alleged no facts which would arguably support an equal protection or due process claim (except to the extent that the Fourteenth Amendment's due process clause provides a basis for the false imprisonment claim plaintiff asserts in Count I) and, again, that plaintiff's factual allegations do not implicate the Sixth Amendment.

In his brief, plaintiff "expressly abandons all claims pursuant to 42 U.S.C. § 1985 and § 1986.  However, there is no reference to either of these statutes in the complaint.

8

**§ 1983 Claim**

Plaintiff seeks judgment against all of the defendants under Count I, his § 1983 claim alleging excessive force, false arrest, and false imprisonment in violation of the Fourth and Fourteenth Amendments. Individual defendants Russell and Davidson assert that they are entitled to qualified immunity as to this claim. The municipal/supervisory defendants (Chief Ingram, the police department, the City and the officers in their official capacities) contend that they are entitled to summary judgment because plaintiff cannot establish that a custom, policy or practice of the City of Greenville proximately caused the alleged constitutional violation.

<u>Municipal and Supervisory Liability</u>

> The Supreme Court has placed strict limitations on municipal liability under section 1983. . . . [A] municipality may be held liable for the actions of a police officer only when municipal "official policy" causes a constitutional violation. [Plaintiff] must "identify a municipal 'policy' or 'custom' that caused his injury;" "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."

<u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998)(citations omitted). With regard to supervisory liability:

> It is well established that liability in § 1983 cases cannot be premised solely on a theory of *respondeat superior.* . . . [S]upervisory liability [under § 1983] 'occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant,

rampant and of continued duration, rather than isolated occurrences.'

Bryant v. Jones, 575 F.3d 1281, 1299-1300 (11th Cir. 2009)(citations omitted). The causal

connection may also be established and supervisory liability imposed where there is evidence

that: (1) the supervisor's custom or policy resulted in deliberate indifference to constitutional

rights; or (2) the supervisor either directed his subordinates to act unlawfully or knew that

they would do so and failed to stop them. Campbell v. Johnson, 586 F.3d 835, 841 (11th Cir.

2009)(citation omitted).

The official capacity, supervisory, and municipal defendants argue that – even

assuming a constitutional violation – plaintiff's federal claim against them fails because

"[p]laintiff can present no evidence that a policy or a custom of the City of Greenville was

the moving force behind the alleged constitutional deprivation." (Defendants' brief, p. 15).

They maintain that plaintiff cannot show persistent widespread abuse or constructive or

actual knowledge of such by Chief Ingram. (Id., pp. 14-15). By pointing out the absence of

evidence necessary to establish plaintiff's § 1983 claim against them, these defendants have

met their burden on summary judgment. See Fitzpatrick, 2 F.3d at 1115-16. Plaintiff may

avoid summary judgment only by producing evidence, in a form permitted by Fed. R. Civ.

P. 56(e), of specific facts demonstrating the existence of a genuine issue for trial on this

element of his claim. See Celotex, 477 U.S. at 324.

In his responsive brief, plaintiff cites to no evidence pertinent to the issue of whether

there is a causal connection between any municipal custom or policy or any action on

Ingram's part and the alleged constitutional violations. Plaintiff's statement of facts

addresses only the factual circumstances of his arrest and, in this section, plaintiff does not suggest that Chief Ingram personally participated in or directed the alleged constitutional violations. (See Plaintiff's brief, pp. 1-2). In the portion of his brief responsive to the argument of the official capacity and municipal defendants, plaintiff does not include a single citation to evidence of record. (See Plaintiff's brief, Section IV, pp. 11-13). Instead, plaintiff relies exclusively on: (1) argument that the alleged violation of his rights was the result of an unlawful policy or custom, and that "[t]he conduct of these officers is so widespread and so rampant that the City officials have to either know, or they should have known that these continued occurrences have gone on[;]" and (2) on "facts" argued without citation to evidence – that the Gibsons have complained to supervisors, the Chief and the Mayor about the officers' "barbaric behavior,"[8] and that the City "rewarded the officers by naming them

_____

[8] As noted, plaintiff did not cite any evidence in support of this assertion. Plaintiff testified during his deposition that, at some point before the date of his arrest, he saw Officer Russell hitting Cedric Wilson "about the head and neck" with a flashlight while four or five others held Wilson down. (Plaintiff's depo., pp. 50-55). Plaintiff did not testify that he had reported the officers' conduct to Ingram or anyone else in the City, and the court has found no evidence of record indicating that he or his attorney or anyone else had done so. Plaintiff further testified that, several years previously, he was "attacked" by a police officer one night at the motel. Plaintiff was arrested and charged with disorderly conduct, and his attorney "pled [him] guilty" without plaintiff's knowledge. (Id., pp. 28-29). There is no evidence of record regarding whether plaintiff, or anyone else, complained to Ingram or any City policymaker about the "attack." Plaintiff also testified that, several years before the incident forming the basis for this action, he saw a few officers going through cars parked at plaintiff's motel, and that he saw Russell "coming out from behind the hotel." When plaintiff confronted Russell, Russell "went to arrest [plaintiff], and he grabbed [plaintiff] by the arm, and [plaintiff] just slung him." (Id., pp. 56). The officers threatened to arrest plaintiff and his wife, but did not. Plaintiff called 911, and the officers dispersed. (Id., pp. 57-59). Plaintiff stated that he has a copy of a letter that his attorney, McGowin Williamson, wrote to the Chief "the next day or so," but plaintiff did not testify regarding the content of the letter or file it in evidence. (Id.). Assuming that this testimony is competent evidence that plaintiff's attorney lodged a complaint with Ingram, the court's review of the record reveals that this is the sole instance of previous conduct as to which plaintiff has even arguably demonstrated actual knowledge by Ingram. As to constructive

police officers of the year." (Plaintiff's brief, pp. 12-13).[9] Plaintiff has failed to demonstrate

_____

knowledge, the evidence of record is not sufficient to demonstrate an issue of fact regarding the existence of "'widespread abuse . . . [which was] obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" Bryant, 575 F.3d at 1300 (citations omitted).

[9] The court notes, again without the benefit of any citation to the record by the plaintiff, that plaintiff attached a photograph of three uniformed police officers, apparently receiving plaques from a fourth person, to his responses to interrogatories. (Defendant's Exhibit 3). The photograph appears to have been printed from the WAKA website, and handwriting below the photograph identifies the officers as "Lionel Davidson," "John Bass," "Byron Russell," and the other person as "Chief Lonzo Ingram." During plaintiff's deposition, plaintiff's *attorney* stated that the photograph was "an officer of the year award from the newspaper." (Plaintiff's depo., p. 112). Plaintiff's testimony was as follows:

Q. ... Have you seen that picture before?

A. Let me get my glasses.

MR. HOLTON: That's an officer of the year award from the newspaper.

A. Yeah. I've seen a – not this particular one, I don't believe, but I did see it in the newspaper and stuff.

Q. Okay. And it shows four different men in that picture. And you said it's showing officer of the year? Was that for the City of Greenville?

A. I don't really remember now, to tell you the truth.

Q. What paper did you see it in? Do you remember?

A. I believe it was the Greenville Advocate.

Q. Okay. Can you identify those four men in that picture?

A. Well, I can identify Lionel, Bass, Russell, and Lonzo.

(Plaintiff's depo., pp. 112-13). Even assuming that this testimony is sufficient to demonstrate that the officers were selected for "officer of the year," there is no evidence of record regarding when they were selected for the award, what entity gave the awards, who made the selections, and what the selecting individual (or group of individuals) might have known about alleged constitutional violations by the officers.

the existence of a genuine issue of material fact on the issue of whether there is a causal connection between Ingram's conduct and the alleged constitutional violation. He has not produced evidence of any municipal policy or custom which led to the alleged constitutional violation. Accordingly, Ingram, the City, the police department and the officers in their official capacities are entitled to summary judgment on Count I, plaintiff's § 1983 claim.

Individual Liability of Russell and Davidson

Individual defendants Russell and Davidson argue that – even if there is a question of fact as to whether the officers' conduct was objectively reasonable – they are nevertheless entitled to summary judgment on the basis of qualified immunity. (Defendants' brief, pp. 4-10).

> As [the Eleventh Circuit has] recognized repeatedly, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.' " The purpose of qualified immunity is to allow officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."

> "[T]o receive qualified immunity, an official must first establish that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " "If the official was acting within the scope of his discretionary authority" . . . "the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate."

> Under the qualified immunity standard recently rearticulated by the Supreme Court in *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), [the court is] obliged to grant qualified immunity to a law enforcement officer unless the plaintiff can demonstrate: first, that the facts when viewed in a light most favorable to the plaintiff establish a constitutional violation; and, second, that the illegality of the officer's actions was "clearly established"

at the time of the incident. As we noted in *Lee,* this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."

Oliver v. Fiorino, 586 F.3d 898, 904 -905 (11th Cir. 2009)(internal citations omitted). The court concludes – despite plaintiff's argument to the contrary – that there is no genuine issue of fact regarding whether defendants were performing a discretionary function, for purposes of the § 1983 qualified immunity analysis. See Crosby v. Monroe County, 394 F.3d 1328 (11th Cir. 2004)("To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities.' That is easy here. Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.")(citation omitted). Accordingly, the officers are entitled to qualified immunity unless plaintiff establishes that they violated his constitutional rights and that the illegality of the officers' conduct was clearly established at the time of the incident.

## False Arrest/Imprisonment

The Eleventh Circuit has recently reiterated the law applicable to plaintiff's false arrest/false imprisonment claim and the officers' qualified immunity defense:

> The Fourth Amendment provides that a person has a right to be free from unreasonable searches and seizures. *U.S. Const. Amend. IV.* Whether an arrest of a person, which is a seizure, is reasonable depends on a finding of probable cause. Kingsland [v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004)]. "Probable cause to arrest exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir.1990) (quotations and citation omitted). A

14

warrantless arrest without probable cause violates the Constitution. <u>Kingsland</u>, 382 F.3d at 1226.

Nevertheless, "[w]e do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause." <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1137 (11th Cir.2007). Rather, if an officer violates the Constitution because he lacks probable cause, the officer may still be shielded from liability under the second prong of the qualified immunity analysis because his "actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Case</u> [<u>v. Eslinger</u>, 555 F.3d 1317, 1327 (11th Cir. 2009)] (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)).

In wrongful arrest cases, we have defined the "clearly-established" prong as an "arguable probable cause" inquiry. <u>See</u> <u>id</u>. ("If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed."); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1276 n. 7 (11th Cir.2004) ("Given our conclusion that [defendant] had actual probable cause and no constitutional violation occurred, we need not discuss the arguable probable cause doctrine ... for purposes of determining the second prong of the qualified immunity test."); <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1303 (11th Cir.2001) ("Because [defendant] had arguable probable cause to arrest [plaintiff], he violated no clearly established law...."). The "clearly-established" standard means that even if the arresting officer lacks probable cause, he is still entitled to qualified immunity if there was "arguable probable cause for the arrest, which is a more lenient standard than probable cause." <u>Knight v. Jacobson</u>, 300 F.3d 1272, 1274 (11th Cir.2002).

In determining whether arguable probable cause exists we ask whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." <u>Lee</u> [<u>v. Ferraro</u>, 284 F.3d 1188, 1195 (11th Cir. 2002)(quotations and citations omitted). There is no arguable probable cause if "no reasonable officer could have found probable cause under the totality of the circumstances." <u>Kingsland</u>, 382 F.3d at 1232.

<u>Moran v. Cameron</u>, 2010 WL 200834 (11th Cir. Jan. 21, 2010)(unpublished opinion).

Defendants argue that they had at least arguable probable cause to arrest plaintiff for

the offense of disorderly conduct, as defined in <u>Ala. Code</u> § 13A-11-7(a)(3). Under that section of the statute, "[a] person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . [i]n a public place uses abusive or obscene language or makes an obscene gesture[.]" It has long been the law that the "abusive or obscene language" provision of Alabama's disorderly conduct statute is not violated absent "fighting words," which are "'those words which have a likelihood of causing a violent response by the person to whom they are addressed. They are words that by their very utterance provoke a swift physical retaliation and incite an immediate breach of the peace.'" <u>Swann v. City of Huntsville</u>, 455 So.2d 944 (Ala. Crim. App. 1984)(citations omitted).[10]

In <u>Swann</u>, the defendant uttered the following statement to a City of Huntsville police officer: "This is some shit . . . . Damn you; you're just doing this because I'm black. You're bringing us back a hundred years." 455 So.2d 950. The court reversed Swann's conviction for disorderly conduct under the statutory provision at issue here, <u>Ala. Code</u> § 13A-11-7(a)(3), finding that the comment "did not contain a threat and did not have the likelihood of causing a violent response by the police officer to whom they were addressed." <u>Id</u>. The court stated, "While Swann's language may have aroused the anger and resentment of Officer Green, we do not believe that it was calculated to provoke physical retaliation,

---

[10] Defendants downplay the "fighting words" requirement, noting that it appears in the commentary to the statute but not the actual statute. (Defendants' brief, p. 9 n. 1). However, this requirement has long appeared in Alabama cases interpreting the statute. Thus, the "fighting words" requirement is not, as defendants argue, merely a matter of "commentary." It is law.

especially in view of the probable training received by the officer in dealing with similar situations." Id. The court relied on Skelton v. City of Birmingham, 342 So.2d 933 (Ala. Crim. App.), *remanded,* 342 So. 2d 937 (Ala. 1976), in which "[t]he language deemed *not* to constitute fighting words when addressed to a police officer . . . was, 'Are you big shits going to move or am I going to have to go around." Swann, 455 So. 2d at 950 (emphasis in original). To constitute fighting words, the words "must be sufficiently offensive to raise a probability of physical retaliation by the addressee or someone acting in his interest." H.N.P. v. State, 854 So.2d 630, 632 (Ala. Crim App. 2003)(internal quotation marks and citations omitted)(reversing adjudication of delinquency based on Ala. Code § 13A-11-7(a)(3) where juvenile, speaking on her cell phone in a "clearly audible" voice in a restaurant with 16 to 18 other people present, used the words "motherfucker," "fuck," and "ass," finding that the State failed to prove that the juvenile used "fighting words"); R.I.T. v. State, 675 So. 2d 97 (Ala. Crim. App. 1995)(finding that the words "fuck you" spoken by a juvenile to a police officer, in front of only family members, as the juvenile was walking away from the officer, did not – "though reprehensible" – constitute "fighting words" sufficient to support an adjudication of delinquency pursuant to Ala. Code § 13A-11-7).

Viewed in the light most favorable to the plaintiff, the evidence before the court is that plaintiff said that the officers had a "damn bad attitude" while addressing his wife in a normal tone of voice with his back to the police officers; that he was coaxing his wife to go inside; and that no one else was at the scene until Mrs. Gibson started yelling for her guests

to come outside.[11]  Under these circumstances, the officers lacked probable cause to arrest

the plaintiff for disorderly conduct, as defined in <u>Ala. Code</u> § 13A-11-7(a)(3).  The court

further concludes that the officer also lacked arguable probable cause.  In making this

determination, the court looks to the case law established by the Supreme Court, the Court

of Appeals for the Eleventh Circuit, and the Alabama Supreme Court.  <u>Poulakis v. Rogers</u>,

341 Fed. Appx. 523, 527-28 (11th Cir. 2009)(citations omitted).  These courts have not

analyzed the reach of <u>Ala. Code</u> § 13A-11-7(a)(3), the particular statutory provision at issue

here.  However, both the United States Supreme Court and the Alabama Supreme Court have

previously ruled, in cases involving closely analogous disorderly conduct statutes, that such

---

[11]  Plaintiff testified as follows:

Q. . . . When you were outside with Officer Russell and Officer Davidson, was Jerry Erwin still out there, or had he already left?

A.  No.  He had, I believe, went upstairs to where he was living.

Q.  He was living at the motel at the time?

A.  Right.

Q.  Okay.  Have you talked to him about this lawsuit?

A.  Not really.

Q.  Do you know if he saw anything that happened that day?

A.  The only person that really knew what went down was my wife.  There was – *there was nobody else* – there was other people – her girlfriends were sitting in there, and they – when she started hollering, they came out.  But they didn't see the actual thing.

(Plaintiff's depo., pp. 69-70 (emphasis added); <u>see also</u> Defendants' Exhibit 3, affidavits of Jerry Erwin, Mary Erwin and Deborah Lowery).

statutes are constitutionally invalid unless they are very narrowly construed. In <u>Gooding v. Wilson</u>, 405 U.S. 518 (1972), the United States Supreme Court considered a Georgia misdemeanor statute which prohibited "opprobrious" and "abusive" language. The court noted that its decisions since <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568 (1942), "have continued to recognize state power constitutionally to punish 'fighting' words under carefully drawn statutes not also susceptible of application to protected expression[.]" 405 U.S. at 523 (citations omitted). The Court, after determining that the Georgia statute before it had not been limited by the state courts to "fighting" words, found the statute to be unconstitutionally vague and overly broad. <u>Id</u>. at 527-28. In reaching its finding, the Court determined that the words, "'Get the G-- d-- bed rolls out . . . let's see how close we can come to the G-- d-- tents'" and "God damn you, why don't you get out of the road?" – "are not 'fighting' words as Chaplinsky defines them." <u>Id</u>. at 525. In <u>Lewis v. City of New Orleans</u>, 415 U.S. 130 (1974), the Supreme Court found the Louisiana Supreme Court had not defined the terms in a statute which made it unlawful "to curse or review or to use obscene or opprobrious language toward" a police officer so as to limit the reach of the statute to the "constitutional definition of 'fighting words' announced in <u>Chaplinsky</u> . . . and reaffirmed in <u>Gooding</u>." <u>Id</u>. at 132. Finding that the statute, as construed by the Louisiana Supreme Court, was "susceptible of application to protected speech[,]" the Court found the statute to be constitutionally overbroad and facially invalid. <u>Id</u>. at 134.

In <u>Skelton v. City of Birmingham</u>, 342 So.2d 933 (Ala. Crim. App. 1976), the

Alabama Court of Criminal Appeals considered an ordinance which made it unlawful for a person to make an "insulting remark" to a peace officer or law enforcement engaged in the discharge of his duties. The defendant in that case, as noted above, had said to police officers, "Are you big shits going to move or am I going to have to go around[.]" The Court of Criminal Appeals, after analyzing Chaplinsky, Gooding, and Lewis, construed the term "insulting language" to be limited to "to fighting words only; they are those words which have a likelihood of causing a violent response by the person to whom they are addressed. They are words that by their very utterance provoke a swift physical retaliation and incite an immediate breach of the peace." Id. at 936-37. The Court of Criminal Appeals reversed the defendant's conviction, and remanded the case to the trial court "with instructions that any future trial will be conducted with an eye to the construction that we place on the statute today." Id. The defendant then appealed to the Alabama Supreme Court. The Alabama Supreme Court, after considering the facts set forth by the Court of Criminal Appeals, found that the lower appellate court had erred by remanding the case for a new trial. The Alabama Supreme Court – implicitly concluding that the words spoken by the defendant were not "fighting words" – remanded the case to the Court of Criminal Appeals, directing that it amend its judgment to read "REVERSED AND RENDERED," rather than "REVERSED AND REMANDED." Skelton v. City of Birmingham, 342 So.2d 937 (Ala. 1976).

Similarly, in Ex Parte N.W., 748 So.2d 190 (Ala. 1990), the Alabama Supreme Court noted that the "abusive or obscene language" or "obscene gesture" language of Alabama's

harassment statute – language identical to that used in the disorderly conduct statute at issue here – required proof of "fighting words." Id. at 193. The court cited Robinson v. State, 615 So.2d 112, 113 (Ala. Crim. App. 1992), in which the Court of Criminal Appeals based its holding on Swann and quoted Swann's analysis of the language in the disorderly conduct statute on which the defendants now rely to support plaintiff's arrest. The Alabama Supreme Court further cited B.E.S. v. State, 629 So.2d 761, 764 (Ala. Crim. App. 1993) for the proposition that "fighting words" are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Ex Parte N.W., 748 So.2d at 193.

Against this backdrop, the court cannot conclude that any reasonable officer "in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest"[12] the plaintiff for stating to his wife, in a normal tone of voice with no witnesses other than the defendant officers, that the officers had a "damned bad attitude."[13, 14] Accordingly, the officers lacked arguable probable cause and

---

[12] Lee, 284 F.3d at 1195.

[13] The court notes that it would reach the same result even if it had accepted the testimony of plaintiff's wife – that plaintiff said the officers had a "God damn bad attitude" and referred to the officers as "assholes" – as true. (See note 2, *supra*).

[14] Defendants rely on Gold v. City of Miami, 121 F.3d 1442 (11th Cir. 1997) – noting that it "involved facts remarkably similar to the case at hand"– to support the argument that they had arguable probable cause. (Defendants' brief, p. 9). The Gold record, however, "reflect[ed] that Gold twice used profanities in a loud voice, in a public place, and in the presence of others." Id. at 1446. The Eleventh Circuit's conclusion that the officers had arguable probable cause was based on its analysis of Florida law, particularly "the varying views in the Florida appellate courts of what constitutes legally proscribed disorderly conduct." Id. at 1446; See J.S. v. Campbell, 2006 WL

are not entitled to qualified immunity on this claim.

Excessive Force[15]

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 395 (1989). "[A]pplication [of this standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The excessive force standard "looks to the need for force, the amount of force used, and the injury inflicted." Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997).

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

2864254, 5 n. 21 (M.D. Ala. Oct. 5, 2006)(pointing out that the Eleventh Circuit's finding rested on the "varying views" in the Florida appellate court and stating, "Unlike Gold, there are no "varying views" in the Alabama appellate courts as to the conduct at issue in the present case."). In the present case, as in J.S., the court's review of Alabama law reveals no "varying views" suggesting that plaintiff's conduct – using a curse word in a statement to his wife in front of police officers – could even arguably support a lawful arrest. See cases cited supra, pp. 15-17.

[15] To the extent that plaintiff claims that the force used was excessive solely because the arrest was unlawful, his excessive force claims are subsumed in the unlawful arrest claim. Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000). The court analyzes the excessive force claim separately, however, because it appears that plaintiff is also asserting that the force used was excessive even if the arrest were lawful. See Complaint, ¶ 18; Bashir v. Rockdale County, Georgia, 445 F.3d 1323, 1332 (11th Cir. 2006)("When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest.").

vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively unreasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Graham, *supra*, 490 U.S. at 396 (citations omitted). "An officer will be entitled to qualified immunity [as to an excessive force claim] if his actions were "objectively reasonable"– that is, if a reasonable officer in the same situation would have believed that the force used was not excessive." Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998)(citing Anderson v. Creighton, 483 U.S. 635 (1987)).

Defendants argue that in the Eleventh Circuit a person does not have a right to resist even an unlawful arrest forcibly, that plaintiff was "charged with resisting arrest," and that the "undisputed material facts do not show that the defendant officers' actions were objectively unreasonable under the Fourth Amendment, or so unreasonable that an officer faced with these officers' situation would have inevitably believed that the force used was unlawful." Therefore, they assert, "these Defendants are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims." (Defendants' brief, pp. 9-10). This argument misses the mark, as it ignores the present posture of this case – *i.e.,* summary judgment – and

also overlooks plaintiff's testimony: (1) that he did *not* resist the officers at any point; (2) that after he was "subdued on the ground, laying there face down on the ground, Russell lifted [his] head up by the hair, and told Lionel to start spraying the pepper spray, put it in his eyes; put it in his nose; put it in his mouth"; (3) that Davidson complied, spraying "a steady stream, moving from one thing to the other"; and (4) that plaintiff's arms were restrained behind him at the time. (See plaintiff's depo., pp. 84-90).

In Thornton, the Eleventh Circuit affirmed the district court's rejection of the officers' qualified immunity defense on summary judgment, stating:

> Neither Thornton nor Cravey was suspected of having committed a serious crime, neither posed an immediate threat to anyone, and neither actively resisted arrest. Yet, on the facts viewed in the light most favorable to the plaintiffs, the officers used force in arresting both Thornton and Cravey. The officers grabbed Thornton and wrestled him to the ground, and threw Cravey on the hood of one of the patrol cars before handcuffing him. Under the circumstances, the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force used was excessive.

Thornton, 132 F.3d at 1400. In the present case, likewise, plaintiff was not suspected of having committed a serious crime, he did not pose an immediate threat to anyone, and he did not actively resist arrest. Yet – viewing the evidence in the light most favorable to the plaintiff – the officers, without telling plaintiff that he was under arrest, hit plaintiff from behind, knocking him into the glass door of the motel, jerked his arms back, knocked him down to the ground and sprayed him with pepper spray as described above. (Plaintiff's depo., pp. 82-90, 142-43). "Under the circumstances, the officers were not justified in using *any*

force, and a reasonable officer thus would have recognized that the force used was excessive." Thornton, *supra*. "Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." Vinyard v. Wilson, 311 F.3d 1340, 1348-49, 1355 (11th Cir. 2002)(finding officer's use of pepper spray to constitute excessive force and denying qualified immunity where the plaintiff "was under arrest for offenses of minor severity, handcuffed, secured in the back of a patrol car, and posing no treat to Officer Stanfield, herself or the public"). See also Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998)("The district court was likewise correct in holding that Webster was not entitled to qualified immunity on plaintiff's excessive force claim. Under plaintiff's allegations, Webster pushed her against a soda machine, handcuffed her, and dragged her to the police car. There is no evidence in the record to suggest that plaintiff posed a danger to the officer or others. Accordingly, because of the absence of any justification for Webster's use of force, application of the Fourth Amendment reasonableness standard "'would inevitably lead every reasonable officer . . . to conclude that the force was unlawful.'")(citation omitted). See also Lloyd v. Van Tassell, 318 Fed. Appx. 755, 758 (11th Cir. 2009)("[O]bjectively unreasonable force does not become reasonable or *de minimis* merely because the plaintiff only suffered minimal harm. In addition . . . force is more likely to be unlawful it if occurred after a suspect was already secured, the arrest effected, and danger vitiated, as opposed to force that occurred while the officer was still securing a suspect. . . . In determining that qualified immunity was not available [in Lee v. Ferraro], we

stated the 'clear and obvious principle that once an arrest[ee] has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ the severe and unnecessary force allegedly used here.'")(unpublished opinion)(citation omitted); Id. at 759 ("Although Lloyd's arrest involved a serious crime and a potentially dangerous situation for the deputies, Lloyd presented evidence that the application of force was objectively unreasonable because it came after he already was subdued and handcuffed, and he did not resist."). Thus, qualified immunity is due to be denied on the excessive force claim.

## State Law Claims

### Merits of Counts II, III, IV, and V

Plaintiff brings an assault and battery claim against Russell and Davidson. (Count III). He also brings false imprisonment (Count II), malicious prosecution (Count IV), and unlawful arrest (Count V) claims against Russell, Davidson, and the City of Greenville. Defendants argue that these claims are due to be dismissed on the merits because: (1) "the detention of Plaintiff was not unlawful;" (2) "the encounter Plaintiff had with Defendants was based on at least arguable probable cause, and therefore cannot be said to be unlawful;" (3) as to the malicious prosecution claim, "there is no evidence of malice and the officers had arguable probable cause for the arrest, notwithstanding that Plaintiff was eventually acquitted." (Defendants' brief, pp. 10-11). As fully discussed above, the evidence – viewed in the light most favorable to plaintiff – is sufficient to demonstrate a lack of even arguable probable cause for plaintiff's arrest or detention. Additionally, "[i]t is well established that for purposes of a malicious-prosecution claim, the element of "malice" may be inferred from

the lack of probable cause[.]" Ex Parte Tuscaloosa County, 796 So.2d 1100, 1107 (Ala. 2000)(citations omitted). Accordingly, the only arguments that defendants have advanced on the merits of Counts II, III, IV and V are unavailing.

Discretionary Function Immunity

Section 6-5-338 of the Alabama Code extends state agent discretionary function immunity to city police officers. Ala. Code § 6-5-338; Couch v. City of Sheffield, 708 So.2d 144 (Ala. 1998).[16] The statute also extends immunity to the municipalities that employ them. Montgomery v. City of Montgomery, 732 So.2d 305, 312 (Ala. Civ. App. 1999); Richards v. Southeast Alabama Youth Services Diversion Center, 105 F.Supp.2d 1268, 1282

---

[16] The statute provides, in pertinent part:

(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

(b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers. No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours.

Ala. Code § 6-5-338 (a), (b).

(M.D. Ala. 2000).  "Whether a qualified peace officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by <u>Ex parte Cranman</u>, 792 So.2d 392 (Ala. 2000), and adopted by a majority of [the Alabama Supreme Court] in <u>Ex parte Butts</u>, 775 So.2d 173 (Ala. 2000), and <u>Ex parte Rizk</u>, 791 So.2d 911 (Ala. 2000)."  <u>Hollis v. City of Brighton</u>, 885 So.2d 135, 143 (2004).  Under that test,  "'[a] State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the enforcement of the criminal laws of the State including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons[.]'"  <u>Ex parte Butts</u>, 775 So.2d 173, 177-78 (Ala. 2000)(citation omitted).  However, "'a State agent *shall not* be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States, or the Constitution of [Alabama], or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'"  <u>Id</u>. (citation omitted).

Russell and Davidson argue that they are entitled to immunity as to all of plaintiff's state law claims because they "were performing law enforcement duties at the time when they were dispatched to the Plaintiff's motel/residence," and because "there is no evidence of the malice willfulness, or bad faith required to overcome the immunity granted by the statute." (Defendants' brief, p. 13).  However, the Alabama Supreme Court has held that the

absence of "arguable probable cause" defeats an officer's claim of immunity under § 6-5-338. Borders v. City of Huntsville, 875 So.2d 1168, 1179-82 (Ala. 2003)(reversing summary judgment in favor of officer on the basis of § 6-5-338 immunity on plaintiff's claims of "excessive force[,] . . . false arrest, false imprisonment and assault and battery[,]" where there was evidence that could support a finding that the officer lacked arguable probable cause);[17] see also Mann v. Darden, 630 F. Supp. 2d 1305, 1315 (M.D. Ala. 2009)(denying an arresting officer's claim of immunity on state law battery claim after observing that "[t]he Alabama Supreme Court has held that, while arrests and attempted arrests are generally discretionary functions, officers will not be given discretionary-function immunity when they act without arguable probable cause.")(citing Borders); id. at 1316 ("Because the facts that would enable a determination of arguable probable cause to be made are in genuine dispute, Darden is not entitled to immunity for the force used in the course of the incident that led to Mann's disorderly conduct charge.").

In Borders, the Alabama Supreme Court – despite the issue of fact regarding arguable probable cause – affirmed the trial court's grant of summary judgment in favor of the officer on the malicious prosecution claim. However, the court did so because malice is an essential element of a malicious prosecution claim and the plaintiff, in his brief, expressly stated that

---

[17] In Borders, the Alabama Supreme Court determined that the issue of fact regarding "arguable probable cause" goes to the question of whether the officer was engaged in a discretionary function. Even if the absence of arguable probable cause did not defeat an officer's claim that he was engaged in a discretionary function – as the court held – the absence of arguable probable cause would permit an inference of actual malice or bad faith.

he did not claim that the officer's "conduct was done in malice, bad faith or with willfulness," but rather, that the officer's conduct was actionable because of his "neglect, carelessness, or unskillfulness." Borders, 875 So.2d at 1178, 1182. In the present case, in contrast, plaintiff makes no such concession. Instead, he alleges that the defendant officers acted "maliciously and without probable cause." (Complaint, ¶ 45). The court concludes that the evidence which permits a finding that the officers lacked arguable probable cause both deprives the officers of their claim that they were exercising a discretionary function, under the Borders analysis, and also is sufficient to support a finding of "malice" or "bad faith." Accordingly, defendants Russell and Davidson are not entitled to summary judgment on any of plaintiff's state law claims on the basis of discretionary function immunity pursuant to Ala. Code § 6-5-338.[18]

## Count VI - Negligent Training and Supervision

Plaintiff brings his state law claim of negligent training and supervision against defendants Ingram and the City. (See Complaint, ¶¶ 56-62).[19] Defendants have understandably treated this claim as one brought pursuant to 42 U.S.C. § 1983. (See n. 7,

---

[18] Neither the City nor defendant Ingram asserted discretionary function immunity as a basis for summary judgment on plaintiff's state law claims. (See Defendants' brief, pp. 11-13). Under Alabama law, a court resolves the immunity issue using a "'burden-shifting' process" under which the party claiming the protection of state-agent immunity pursuant to Ala. Code § 6-5-338 bears the initial burden of "'demonstrating that the plaintiff's claims arise from a function that would entitled the State agent to immunity.'" Ex parte Kennedy, 992 So.2d 1276, 1282 (Ala. 2008).

[19] Alabama courts make no distinction between claims of negligent training and negligent supervision. Southland Bank v. A & A Drywall Supply Co., Inc., 21 So.3d 1196, 1215 n. 17 (Ala. 2008), cert. denied, Anderson v. Southland Bank, 130 S.Ct. 275 (2009).

*supra*). However, defendants argue that there is no evidence of inadequate training or supervision, evidence which is required whether plaintiff brings this claim under federal or state law. (<u>See</u> Defendants' brief, pp. 15-18). In order to prove his state law negligent training/supervision claim, plaintiff must establish that Russell and Davidson were "incompetent" and must also produce affirmative evidence demonstrating that Ingram and the City either knew or reasonably should have known of their incompetency. <u>Southland Bank</u>, 21 So.3d at 1216-17. As discussed previously in connection with plaintiff's federal claim, the evidence of record is insufficient to permit an inference that Ingram or any other City official knew or reasonably should have known of any incompetency – assuming that plaintiff had demonstrated such incompetency – on the part of Russell or Davidson. <u>See</u> *supra*, n. 8. Plaintiff clearly has not produced affirmative evidence "showing specific acts of incompetency and bringing them home to the knowledge of the master," nor has he shown that any specific acts of incompetency by Russell or Davidson are of "such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice." <u>Southland Bank</u>, 21 So.3d at 1214-15 (citations omitted).[20] Accordingly, defendants are entitled to summary judgment on Count VI.

---

[20]  As discussed previously, the court's review of the record revealed but a single instance of conduct on the part of Russell as to which plaintiff has even arguably demonstrated knowledge by Ingram. <u>See</u> n. 7, *supra*. Again, plaintiff has not provided evidence of the content of his attorney's letter to Ingram. Ingram's knowledge of a single instance of alleged misconduct by Russell is not sufficient to demonstrate that Ingram knew, or should have known, that Russell is incompetent.

**CONCLUSION**

For the foregoing reasons, it is ORDERED that:

(1) defendants Ingram, Russell and Davidson – in their official capacities – and the City of Greenville Police Department are DISMISSED as defendants because plaintiff's claims against them are redundant, given his claims against the City of Greenville;

(2) defendants' motion for summary judgment on Count I, plaintiff's § 1983 claim, is GRANTED as to Ingram and the City, and DENIED as to defendants Russell and Davidson;

(3) defendants' motion for summary judgment on Counts II, III, IV, and V is DENIED;

(4) defendants' motion for summary judgment on Count VI, plaintiff's state law claim of negligent training and supervision, is GRANTED.

Done, this 2nd day of February, 2010.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE